UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

WAYNE EDWARDS,

                    Plaintiff,

          v.

HUNTINGTON UNION FREE SCHOOL
DISTRICT,

                    Defendant.

---------------------------------------------------------------x

**MEMORANDUM & ORDER**

11-CV-1408 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Wayne Edwards brings the above-captioned action against Defendant

Huntington Union Free School District, asserting claims of racial discrimination, hostile work

environment and retaliation under Title VII, § 1981, § 1983, New York State Human Rights Law

and Suffolk County Human Rights Law.  Defendant moved for summary judgment and

attorneys' fees.  The Court heard oral argument on May 29, 2013.  At oral argument, Plaintiff

withdrew all claims under New York State Human Rights Law and Suffolk County Human

Rights Law, as well as all retaliation and hostile work environment claims.  For the reasons set

forth below, the Court grants Defendant's motion for summary judgment on Plaintiff's

remaining claims and denies Defendant's motion for attorneys' fees.

  **I.**   **Background**

      Plaintiff was hired in 2005 as the District Director of Mathematics at Huntington Union

Free School District (the "District" or "Defendant").  (Def. 56.1 ¶ 41.)  According to Plaintiff, he

was interviewed by Margaret Evers who recommended him to the Superintendent and the

District's Board of Education (the "Board").  (Pl. 56.1 ¶ 43.1.)  According to Defendant, Plaintiff

was hired on the recommendation of John Finello, then Superintendent of Schools.  (Def. 56.1 ¶ 43.)  Plaintiff's employment was approved by the Board.  (*Id.* at ¶ 44; Pl. 56.1 ¶ 44.)  Several years later in a May 13, 2008 letter, Finello described Plaintiff's service as "outstanding."  (Def. 56.1 ¶ 48; Pl. 56.1 ¶ 48.)  Finello recommend Plaintiff for tenure on June 9, 2008 and the Board approved Plaintiff's tenure the same day.[1]  (Def. 56.1 ¶¶ 48–50; Pl. 56.1 ¶¶ 48–50.)

When Plaintiff was hired, the Director of Mathematics was not required to teach classes.  (*See* Def. 56.1 ¶ 53; Pl. 56.1 ¶ 53.)  Plaintiff's job duties included "supervis[ing] the K-12 math program at the District, provid[ing] professional development for K-12 math staff, evaluat[ing] math teachers, and implement[ing] the math curriculum."  (Def. 56.1 ¶ 53; Pl. 56. 1 ¶ 53.)  Plaintiff "also met with peer staff to ensure delivery of effective instruction with regards to mathematics, and observed and evaluated approximately 35 teachers."  (Pl. 56.1 ¶ 53.2.)  Plaintiff asserts that he "was also 'very familiar' with a number of different technologies," was called when teachers had problems using technology, and was "responsible for bringing new initiatives to the department, including technology initiatives."  (*Id.* at ¶¶ 53.3–53.4.)

During the 2008/2009 school year, the Board, the Central Administration[2] and Defendant considered ways to reduce the District's budget, including "downsizing at the administrative level" and possibly reducing the number of administrative positions.  (Def. 56.1 ¶¶ 67, 70; Pl. 56.1 ¶ 71.1.)  As a result, a number of administrative positions were reduced in the 2008/2009 school year.  (Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72.)  According to Defendant, "Finello did not want to lose a [d]irector position, as he felt they were key positions."  (Def. 56.1 ¶ 73.)  At a budget

---

[1]  That same day the Board also granted Dr. Kenneth Card, an African American, tenure as an elementary school principal.  (Def. 56.1 ¶ 52.)

[2]  "The District's Central Administration consists of the Superintendent and Assistant Superintendents."  (Def. 56.1 ¶ 10.)

meeting, Finello told administrators that they would have to take on additional responsibilities because of budget cuts.  (*Id.* at ¶ 75; Pl. 56.1 ¶ 75.)  There was an informal proposal to combine the Director of Mathematics and Director of Science positions, which would have resulted in one of the directors being eliminated.  (Def. 56.1 ¶¶ 78–79; Pl. 56.1 ¶¶ 78–79.)

As part of Central Administration's plan not to cut any director position, it proposed having two directors teach classes "to deal with budget issues and save money."[3]  (Def. 56.1 ¶¶ 87–88; *see also* Pl. 56.1 ¶¶ 87–88.)  Defendant believed that the proposal would save money, since "it would preclude the need to have another teacher, or to hire a teacher to, teach the classes the [d]irectors would teach."  (Def. 56.1 ¶ 98; *see also* Pl. 56.1 ¶ 98.)  At the time of the proposal, there were seven directors and Plaintiff was the only African American director.  (Pl. 56.1 ¶¶ 88.1–88.2.)  Plaintiff learned of the proposal to have two directors teach "sometime after Christmas break."  (Def. 56.1 ¶ 95.)  According to Plaintiff, requiring directors "to teach would have a negative effect on their ability to supervise their staff" and would affect their "ability to observe other teachers, conduct meetings, and attend superintendent cabinet meetings."  (Pl. 56.1 ¶¶ 101.1–101.2.)  Plaintiff's union (the "Union") was not in favor of the plan and "[e]veryone in the district knew that there is simply not enough time to both teach effectively and be a competent [d]irector."  (*Id.* at ¶¶ 101.3–101.4, 101.6.)

In June 2009, the Technology Coordinator retired.  (Def. 56. ¶¶ 103–104; Pl. 56.1 ¶¶ 103–104.)  "The Technology Coordinator ensured that teachers had the necessary software to run any educational software, ensured that the SMART boards were working, and provide[d] training, amongst other duties."  (Def. 56.1 ¶ 108; *see also* Pl. 56.1 ¶ 108.)  The Technology Coordinator "also conducted after-school professional development on instructional technology."

---

[3]  Defendant asserts that other directors taught classes in the past.  (Def. 56.1 ¶ 94.) Plaintiff asserts that no director prior to Plaintiff taught classes.  (Pl. 56.1 ¶ 94.)

(Def. 56.1 ¶ 109; *see also* Pl. 56.1 ¶ 109.)  Defendant asserts that "[t]he Technology Coordinator was a teaching position, not an administrative-level position."  (Def. 56.1 ¶ 105.)  According to Plaintiff, "[t]he position was a 'teaching-level' position in terms of salary and whether the position was authorized to do formal observations, only because the person who held the position was a teacher, but the position itself required no teaching duties."  (Pl. 56.1 ¶ 105.1.)

Finello gave the Union an opportunity to propose creative alternatives to having directors teach classes.  (Def. 56.1 ¶ 111.)  In a letter dated April 16, 2009, the Union proposed that David Casamento,[4] a Caucasian male and the Director of Science, and Plaintiff share the duties of the Technology Coordinator who retired in June.  (*Id.* at ¶¶ 31, 114; Pl. 56.1 ¶¶ 31, 114.)  Defendant asserts that the Union's proposal was not helpful to its budget needs because it "did not create any increase in teaching without increase in budget" and was therefore not included in the final budget recommended to the Board.  (Def. 56.1 ¶¶ 117–119.)  According to Plaintiff, the Union was never told it had to increase teaching with its proposal and, in any event, the final proposal that was sent to the Board did not increase teaching, since under the final proposal, Casamento became the Technology Coordinator and someone else had to be hired to teach the science classes.  (Pl. 56.1 ¶¶ 117–118.3.)

In the final proposal, Defendant created a position called the Director of Science and Instructional Technology and selected Casamento for the position.  (Def. 56.1 ¶¶ 122, 151; Pl. 56.1 ¶¶ 122, 151.)  Plaintiff alleges that the position of the Director of Technology and Science was created specifically for Casamento, rather than giving the Plaintiff a fair opportunity to have the Technology position added to his duties and creating a Director of Technology and

---

[4]  David Casamento was hired by the District as Director of Science in 2009 and was untenured.  (*See* Def. 56.1 31; Pl. 56.1 ¶ 35.1.)

Mathematics. (Pl. 56.1 ¶¶ 124–158.1.) Defendant alleges that the Director of Technology and

Science position was created and given to Casamento for several reasons. (Def. 56.1 ¶¶ 125–

138.) Defendant alleges that Casamento had expressed an interest in the position to multiple

individuals, including Finello, and Casamento applied for the position. (*Id.*) Defendant also

asserts that there was more room for integration between science and technology than

mathematics and technology, and, therefore, the position was created to integrate science and

technology and required a science background. (*Id.* at ¶¶ 128, 149.) Plaintiff asserts that he also

expressed an interest in technology, but Defendant only interviewed Casamento. (Pl. 56.1

¶¶ 124.11, 125.1.) Plaintiff also asserts that the position was created for Casamento and thus

required a background in science. (*Id.* at ¶¶ 124.11, 137–137.2, 149.1.) Plaintiff further asserts

that Finello did not know whether Casamento was better qualified to handle technology and that

Plaintiff actually had more experience and was better qualified to handle educational technology.

(*Id.* at ¶¶ 125–128.2, 141–141.5, 145.1.)

The parties agree that Casamento "did not get any additional money or stipend as the

Director of Science & Instructional Technology beyond that which he had earned as [the]

Director of Science," and that Plaintiff earned more money than Casamento. (Def. 56.1 ¶¶ 152,

154, Pl. 56.1 ¶¶ 152, 154.) The parties also agree that the head of the Union was concerned

about whether Casamento would be able to handle the additional responsibilities and "whether

he would have the time to perform them all." (Def. 56.1 ¶ 157; Pl. 56.1 ¶ 157.) As a result of

being given the technology responsibilities, Casamento did not have to teach any classes, as

required by the first plan proposed by Central Administration which required both Plaintiff and

Casamento to teach two classes. (Def. 56.1 ¶ 155; Pl. 56.1 ¶ 155.3, Stern Decl. Ex. V.) The plan

5

to have Plaintiff teach two classes remained unchanged.  (Def. 56.1 ¶ 155; Pl. 56.1 ¶ 155.3, Stern Decl. Ex. V.)

On June 12, 2009, Plaintiff sent a letter to Finello, the Board, and others stating that "he felt there was inequity in [P]laintiff being required to teach."[5]  (Def. 56.1 ¶¶ 159–161; *see also* Pl. 56.1 ¶¶ 259–161.)  In response to the letter, Plaintiff was contacted by Joseph Giani, the Assistant Superintendent for Personnel and General Administration, who told Plaintiff that he should not have sent the letter.  (Def. 56.1 ¶ 165; Pl. 56.1 ¶ 165.)  The attorney for the District also called Plaintiff and told him that "his salary could be reduced as he could now be considered only a part-time administrator and told him, in sum and substance, he should be 'happy [he] still [had] a job.'"  (Pl. 56.1 ¶ 165.1.)  Plaintiff understood this to be a threat.  (*Id.* at ¶ 165.2.)

On June 15, 2009, Finello received an email from Plaintiff expressing his dissatisfaction with the decision requiring Plaintiff to teach.  (Stern Decl. Ex. V.)  In response to the email, Finello met with Plaintiff.  (*Id.*)  "Finello asked [P]laintiff to consider alternative means to provide funding for the .4 [Full Time Equivalent ("FTE")] teaching in order for the District to consider removing the teaching responsibilities."[6]  (Def. 56.1 ¶ 173; Pl. 56. 1 ¶ 173.)  According to Defendant, Plaintiff, working with the Union, failed to submit a plan that would produce savings.  (Def. 56.1 ¶ 174.)

As part of the final plan, Plaintiff was required to teach 0.4 FTE for teaching and 0.6 FTE for administrative duties.  Plaintiff was allowed to choose his own classes and he chose to teach two Academic Intervention Services ("AIS") classes, which were between 40 to 44 minutes in length.  (*Id.* at ¶¶ 182–184.)  Defendant asserts that by having Plaintiff teach, without any

---

[5]  Plaintiff did not mention his race in the letter.  (Def. 56.1 ¶ 162, Stern Decl. Ex. Z.)

[6]  0.2 FTE is the equivalent of one class or section.  (Def. 56.1 ¶¶ 83–84.) 1.0 FTE equals one full time course load.  (*Id.* at ¶ 192.)

increase in his salary, it was able to reduce teaching costs. (*Id.* at ¶¶ 191–195.) Prior to Plaintiff teaching the two classes, two teachers were required to teach additional mathematics classes and were paid overtime wages. (*Id.*) Under Defendant's plan, those two teachers were no longer required to work overtime hours. (*Id.*) Plaintiff asserts there was no savings in Defendant's plan because Defendant had to hire a full time science teacher. (Pl. 56.1 ¶¶ 174.1, 191–195.1.) Plaintiff also asserts that since he assumed the duties of two teachers already on staff, the District did not achieve an increase in teaching capacity in mathematics. (*Id.*) Plaintiff missed 33 classes in the first two months of the 2009/2010 school year. (Def. 56.1 ¶ 201; Pl. 56.1 ¶ 201.) Plaintiff missed the classes "because it was impossible to balance all his new teaching responsibilities with his responsibilities as being a district administrator responsible for Math programs in eight different buildings." (Pl. 56.1 ¶ 201.1.)

Plaintiff applied for the Director of Mathematics position at another school prior to the 2009/2010 school year. (Def. 56.1 ¶ 204; Pl. 56.1 ¶ 204.) In October 2009, Plaintiff was offered the position. (Def. 56.1 ¶ 216; Pl. 56.1 ¶ 216.) Plaintiff gave Defendant notice of his resignation on October 7, 2009 and requested that he be relieved of the 30-day notice requirement. (Def. 56.1 ¶¶ 218, 221; Pl. 56.1 ¶¶ 218, 221.) Plaintiff's position remained vacant for approximately a year after his resignation. (Def. 56.1¶ 223; Pl. 56.1 ¶ 223.) He was eventually replaced by Mary Beth Robinette, who was Caucasian. (Def. 56.1 ¶ 224; Pl. 56.1 ¶ 224.1.) Robinette was never required to teach and was the Director of Mathematics and Testing. (Def. 56.1 ¶¶ 229–233; Pl. 56.1 ¶ 224.2.) Defendant alleges that it "saved money by this action, as it combined positions previously held by two individuals," Plaintiff and another former director.[7] (Def. 56.1 ¶ 234.)

_____

[7] After Plaintiff resigned, another director position was changed to a chairperson position and that individual was required to teach two classes and was paid less money as a chairperson. (Def. 56.1 ¶¶ 236, 239.) Casamento resigned the year after Plaintiff resigned because Defendant

II.     **Discussion**

a.      **Standard of Review**

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Kwong v. Bloomberg*, No. 12-CV-1578, 2013 WL 3388446, at *4 (2d Cir. July 9, 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has cautioned that '[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" *Taddeo v. L.M. Berry & Co.*, No. 12-CV-3591, 2013 WL 1943274, at *1 (2d Cir. May 13, 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F .3d 93, 101 (2d Cir. 2010)).

---

proposed either requiring him to teach two classes or turning his position into chairperson position, with a lower salary. (*Id.* at ¶¶ 242–244.)

b.      **Title VII Discrimination Claims**

Title VII discrimination claims are assessed using the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981); *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *Cruz v. Coach Stores*, 202 F.3d 560 (2d Cir. 2000). Under the framework, Plaintiff must first establish a prima facie case of discrimination. *Hicks*, 509 U.S. at 506; *see also Ruiz v. Cnty. Of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). Plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *Hicks*, 509 U.S. at 506). If Plaintiff satisfies this initial burden, the burden then shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. Defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center*, 509 U.S. at 509)). If Defendant offers a legitimate, nondiscriminatory explanation for its action, summary judgment must still be denied, however, if Plaintiff can show that "the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that [her] dismissal was motivated at least in part by [race] discrimination." *Adamczyk v. N.Y. Dep't of Corr. Servs.*, 474 F. App'x 23, 25 (2d Cir. 2012) (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 (2d Cir. 2007)); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred

but for the act.  So-called but-for causation is not the test.  It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

### i.   Prima Facie Case

In order "[t]o establish a claim of racial discrimination a claimant 'must show': (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Ruiz*, 609 F.3d at 491–92.  The parties do not dispute that Plaintiff meets the first two prongs of the prima facie case — Plaintiff is African-American and is a tenured teacher who was hired as a director by Defendant in 2005 and worked as such until October 2009.  However, Plaintiff has not established that he suffered an adverse employment action.  Therefore, Plaintiff has failed to establish a prima facie case of racial discrimination and his case must be dismissed.

Plaintiff has failed to produce evidence that he suffered an adverse employment action. The Second Circuit has defined "an adverse employment action as a 'materially adverse change' in the terms and conditions of employment."  *Sanders v. N.Y.C. Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004).  "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Albuja v. Nat'l Broad. Co. Universal, Inc.*, 851 F. Supp. 2d 599, 606 (S.D.N.Y. 2012) (noting that to satisfy the "adverse employment action" requirement, a plaintiff must present an employment action that affected the deprivation of "some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment." (quoting

10

*Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir. 2002)).  Examples of such a change include

"termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities,

or other indices . . . unique to a particular situation."  *Sanders*, 361 F.3d at 755 (citing *Terry v.

Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2002)).  Plaintiff asserts that he suffered an adverse

employment action when he (1) was required to teach, and (2) was constructively discharged.

(Pl. Opp'n 6–9.)  As discussed below, requiring Plaintiff to teach two classes is not an adverse

employment action and Plaintiff has failed to demonstrate that he was constructively discharged.

### 1.  Requiring Plaintiff to Teach Classes

Plaintiff asserts that he suffered an adverse employment action when he was required to

teach classes in addition to performing his duties as an administrator.  (Pl. Opp'n 6–8.)  "[C]ourts

have repeatedly held that a change in duties — even from a job that the plaintiff 'cherished' —

does not constitute an adverse employment action."  *Morrison v. Potter*, 363 F. Supp. 2d 586,

590 (S.D.N.Y. 2005) (collecting cases); *see also Weisbecker v. Sayville Union Free Sch. Dist.*,

890 F. Supp. 2d 215, 233 (E.D.N.Y. 2012) ("Changes in assignments or duties that do not

'radical[ly] change' the nature of work are not typically adverse employment actions." (citing

*Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000)).  A change in duties or job

reassignment may be an adverse employment action, "if it results in a change in responsibilities

so significant as to constitute a setback to the plaintiff's career."  *Galabya*, 202 F.3d at 641; *see

also Velasquez v. Gates*, No. 08-CV-2215, 2011 WL 2181625, at *10 (E.D.N.Y. June 3, 2011)

("The fact that there is a change in the employee's job duties is not a sufficiently adverse change

unless the change is so unsuited to plaintiff's skills as to constitute a setback to plaintiff's

career."  (citation and internal quotation marks omitted)).  A plaintiff can make such a showing

by demonstrating that the new assignment was "materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." *Galabaya*, 202 F.3d at 641.

"[T]he 'assignment of a disproportionately heavy workload' can constitute an adverse employment action." *Grana v. Potter*, No. 06-CV-1173, 2009 WL 425913, at *12 (E.D.N.Y. Feb. 19, 2009) (citations omitted); *see also Feingold v. New York*, 366 F.3d 138, 152–53 (2d Cir. 2004) (finding that being subjected to "an *excessive* workload" could be an adverse employment action (emphasis added)). "Similarly, '[c]omparatively poor assignments can constitute adverse employment actions.'" *Grana*, 2009 WL 425913, at *12 (citations omitted).

The case law is clear, however, that in order to sustain a claim that a change in work duties amounts to an adverse employment action, a plaintiff must show a material change and failure to produce evidence of a material change requires dismissal of the claim. *See Carter v. New Venture Gear, Inc.*, 310 F. App'x 454, 457 (2d Cir. 2009) ("[The plaintiff] did not meet her burden of raising a genuine issue of material fact that her assignment to an admittedly equally paying and comparable job was materially less prestigious, 'materially less suited to her skills and expertise, or materially less conducive to career advancement.'" (alterations and citation omitted)); *Hernandez v. City of New York*, No. 11-CV-3521, 2013 WL 593450, at *3 (E.D.N.Y. Feb. 13, 2013) ("[T]he Court concludes that Plaintiff's allegations are the same 'alteration' of job responsibilities, rather than 'significantly diminished material' responsibilities, which the Second Circuit has declined to deem an adverse employment action." (citation omitted)); *cf. Grana*, 2009 WL 425913, at *12 (a change in work assignment could be an adverse employment action when it included "denial of training and favorable work assignments, as well as excessive scrutiny" and hurt the plaintiff's ability to "perform her job in an effective manner, advance her career

12

within the Post Office, and obtain overtime"); *Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (a change in work schedule was an adverse employment action when it was accompanied by "an actual loss in income because of lost overtime" and where plaintiff "was forced to work undesirable shifts with an erratic schedule"); *Patrolmen's Benev. Ass'n of N.Y.C., Inc. v. City of New York*, 74 F. Supp. 2d 321, 336 (S.D.N.Y. 1999) (a change of work assignment accompanied by "loss of promotion opportunities and 'good-will' accrued among supervisors in their former precincts" was sufficient for the question of adverse employment action to be decided by a jury).

Plaintiff has failed to provide evidence that being required to teach two classes in addition to his administrative duties was a *material* change in his employment.  It is undisputed that Plaintiff's title and salary remained the same.  (*See* Def. 56.1 ¶¶ 152–153.)  Plaintiff asserts that he was required to take on additional responsibilities, such as "prepare written lesson plans, wherein he determined the needs of the students, set objectives, and create[] individual activities."  (Pl. Opp'n 7; Pl. 56.1 ¶ 184.)  Plaintiff further asserts that prior to teaching, he believed these additional responsibilities would have resulted in his inability to supervise his staff, "observe other teachers, conduct meetings, and attend Superintendent cabinet meetings." (Pl. 56.1 ¶¶ 155.4–155.5.)  Plaintiff basically argues that he was treated adversely when he was not selected for the Director of Technology position and instead forced to teach classes, (Pl. Opp'n 1–3), and being forced to teach affected his "opportunity for professional growth and career advancement."  (Pl. Opp'n 2; *see also id.* at 8.)  However, it is undisputed that although Casamento was selected as the Director of Technology, Casamento did not receive any additional pay, was paid less than Plaintiff, and Casamento's workload was significantly increased.  (Def. Mem. 11; Def. 56.1 ¶¶ 152, 154–155, 157.)  There is no evidence in the record

that Plaintiff's actual workload with the addition of teaching two classes increased more than

Casamento's workload as the Director of Technology.  Plaintiff has also failed to provide

evidence that he actually worked longer hours than he did before he was required to teach.  Nor

is there any evidence that Plaintiff's ability to be promoted and to grow professionally was

materially affected.  Indeed, Plaintiff was able to readily find employment elsewhere as the

Director of Mathematics for another school.

       Plaintiff has not produced any evidence of a change in title, a change in pay, an increase

in hours worked, or a decreased ability to advance his career and has therefore failed to

sufficiently demonstrate that he suffered a materially adverse employment action.  *See, e.g.*,

*Bruder v. Jewish Bd. of Family & Children's Servs.*, No. 10-CV-5951, 2013 WL 789231, at *6

(E.D.N.Y. Mar. 4, 2013) (the plaintiff failed to prove an adverse action where she alleged the

change in work assignment was an adverse action because she "felt" it was below her); *Plahutnik*

*v. Daikin Am., Inc.*, 912 F. Supp. 2d 96, 103 (S.D.N.Y. 2012) (the plaintiff's lateral transfer was

not an adverse employment action where it was "unaccompanied by any reduction of job title,

salary, or benefit" and the plaintiff "failed to identify any materially adverse change in working

conditions associated with this transfer"); *Weisbecker v. Sayville Union Free Sch. Dist.*, 890 F.

Supp. 2d 215, 233 (E.D.N.Y. 2012) ("Not receiving a requested or desired assignment is not an

adverse employment action."); *Kelly v. Huntington Union Free Sch. Dist.*, No. 09-CV-2101,

2012 WL 1077677, at *16 (E.D.N.Y. Mar. 30, 2012) (the plaintiff's job transfer was not an

adverse action where the plaintiff "would receive the same compensation and benefits she

received" prior to the transfer "failed to indicate in any way how her position as a regular teacher

is less prestigious or how she would be less eligible for advancements in a regular teacher

position" but "merely state[d] that it was a 'step down'"); *Adams v. City of New York*, 837 F.

Supp. 2d 108, 120 (E.D.N.Y. 2011) (no adverse action where the plaintiff correction officer "fail[ed] to create a material issue of fact that transfers to the wheel or to undesirable permanent posts resulted 'in a change in responsibilities so significant as to constitute a setback to the plaintiff's career'" (quoting *Galabya*, 202 F.3d at 640)).

### 2. Constructive Discharge

Plaintiff also asserts that he suffered an adverse employment action because he was constructively discharged.  (Pl. Opp'n 8–9.)  A constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action.  *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004).  The standard for constructive discharge is demanding, and it "cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer . . . [or that] the employee's working conditions were difficult or unpleasant."  *Madray v. Long Island Univ.*, 789 F. Supp. 2d 403, 409–10 (E.D.N.Y. 2011) (alterations in original) (quoting *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)).  A constructive discharge occurs only "when an employer 'intentionally creates a work atmosphere so intolerable that [the plaintiff] is forced to quit involuntarily.'"  *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 411 (2d Cir. 2011) (alteration in original) (quoting *Terry*, 336 F.3d at 152); *Andersen v. Rochester City Sch. Dist.*, 481 F. App'x 628, 632 (2d Cir. 2012) (constructive discharge exists when an employer "intentionally create[d] an intolerable work atmosphere that force[d the plaintiff] to quit involuntarily" (quoting *Serricchio v. Wachovia Secs. LLC*, 658 F.3d 169, 185 (2d Cir. 2011)), *cert. denied*, 133 S. Ct. 836 (2013); *Stofsky v. Pawling Cent. Sch. Dist.*, 635 F. Supp. 2d 272, 299 (S.D.N.Y. 2009) ("Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an

15

employee's working conditions so intolerable that the employee is forced into an involuntary resignation." (quoting *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007)).

Constructive discharge requires evidence (1) that the employer acted deliberately or intentionally in bringing about the complained of work conditions, and (2) that the conditions were "intolerable." *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004); *see also Rogers v. Roosevelt Union Free Sch. Dist.*, No. 09-CV-3862, 2012 WL 6163130, at *4 (E.D.N.Y. Dec. 7, 2012) (using the *Petrosino* two-part test).  In order to meet the first requirement, the plaintiff must, at a minimum, show that the employer acted deliberately in bringing about the intolerable work conditions.  *Petrosino*, 385 F.3d at 229–30; *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000) ("[S]omething beyond mere negligence or ineffectiveness is required.").  Next, in order to determine whether the work conditions were "so intolerable as to compel resignation," the conditions must be "assessed objectively by reference to a reasonable person in the employee's position." *Petrosino*, 385 F.3d at 230; *see also Serricchio*, 658 F.3d at 185 ("Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.").

Applying the *Petrosino* two part test, Plaintiff has failed to produce sufficient evidence of constructive discharge to defeat Defendant's summary judgment motion.  According to Plaintiff, "[t]he developments in 2009 had Plaintiff feeling very uncomfortable, and he simply felt that he had no choice but to leave the District."  (Pl. Opp'n 8.)  However, constructive discharge requires more than the employee finding the employment environment to be "very uncomfortable" — the work environment must be "intolerable."  *Petrosino*, 385 F.3d at 230.  The Second Circuit has stated that "the standard is a demanding one, because 'a constructive

16

discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer' or that 'the employee's working conditions were difficult or unpleasant.'"  *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (alteration in original) (citations omitted).  Furthermore, as discussed above, a plaintiff must allege more than a change in job responsibilities to support an adverse employment action, including actions alleging constructive discharge.  *See id.* ("As we have previously explained, an 'adverse employment action' is 'more disruptive than a mere . . . alteration of job responsibilities.'" (alteration in original) (citing *Galabya,* 202 F.3d at 640)).

Plaintiff has produced no additional facts to support his constructive discharge claim and generally relies on the series of events that led to Plaintiff being required to teach.  (Pl. Opp'n 8.) Plaintiff argues that being required to teach made Plaintiff feel as if he had to resign.  (*Id.*) Viewing these facts in the light most favorable to Plaintiff, he has failed to provide sufficient evidence from which a jury could find that he was constructively discharged.  *See, e.g.*, *Miller*, 408 F. App'x at 410 (upholding the dismissal of a case on summary judgment for failure to produce evidence of an intolerable work place); *Rogers*, 2012 WL 6163130, at *4 ("The Court does not doubt that Plaintiff was frustrated by her working conditions, but she has not provided any evidence from which a jury could find a constructive discharge or any other adverse employment action."); *Clarke v. Pacifica Found.*, No. 07-CV-4605, 2011 WL 4356085, at *17 (E.D.N.Y. Sept. 16, 2011) (the plaintiff failed to provide sufficient evidence that she was constructively discharged because there was no evidence that her "employer 'intentionally create[d] a work atmosphere so intolerable that [the employee] [was] forced to quit involuntarily'" (quoting *Miller*, 408 F. App'x at 409)); *Asanjarani v. City of New York*, No. 09-CV-7493, 2011 WL 4343687, at *12 (S.D.N.Y. Aug. 18, 2011) (a statement that a plaintiff might

17

be laid off is insufficient to sustain a hostile work environment claim); *Gingold v. Bon Secours Charity Health Sys.*, 768 F. Supp. 2d 537, 546 (S.D.N.Y. 2011) ("no genuine issue of material fact with respect to [the plaintiff's] constructive discharge claim" because there was no "deliberate action" and the defendant's actions could not be described as "more than simply unpleasant").

        c.      **42 U.S.C. § 1983 and § 1981 Claims**

Plaintiff also brings a claim under § 1981 and § 1983, alleging that Defendant violated his constitutional right to equal protection under the law. The same analytical framework applies whether the disparate treatment claim is brought under § 1981, § 1983 or Title VII. *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013); *Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 188 (2d Cir. 2010); *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). In order to establish a prima facie claim for disparate treatment, the plaintiff must demonstrate that: "(1) [he] is a member of a protected class; (2) [his] job performance was satisfactory; (3) [he] suffered [an] adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." *Demoret*, 451 F.3d at 151; *see also Garcia*, 706 F.3d at 127 (stating that the *McDonnell Douglas* test is used in § 1981 and § 1983 cases). Plaintiff satisfied elements one and two. He is an African American and Defendant does not dispute that his job performance was satisfactory. Since, however, the Court finds that Plaintiff has failed to provide sufficient evidence that he suffered an adverse employment action to establish a claim under Title VII, the Court also finds that Plaintiff has failed to establish an Equal Protection Clause claim pursuant to § 1981 and § 1983. *Garcia*, 706 F.3d at 127.

### d.     Attorneys' Fees

Pursuant to 42 U.S.C. § 1988, "the court, in its discretion, may allow the prevailing party [in a § 1983 action] a reasonable attorney's fee as part of the costs[.]"  *See also Lefemine v. Wideman*, 568 U.S. ---, ---, 133 S. Ct. 9, 11 (2012).  While a prevailing plaintiff, "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust,'" *Lefemine*, 568 U.S. at ---, 133 S. Ct. at 11, "a prevailing defendant may recover attorney's fees only 'when the suit is vexatious, frivolous, or brought to harass or embarrass defendant.'"  *Carter v. Inc. Vill. of Ocean Beach*, No. 07-CV-1215, 2013 WL 816257, at *3 (E.D.N.Y. Mar. 4, 2013) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 429 n. 2 (1983)); *see also Rojas v. Schkoda*, 319 F. App'x 43, 44 (2d Cir. 2009) ("Fees are not to be awarded to a prevailing defendant in a civil rights action unless the plaintiff's action was frivolous, unreasonable, or groundless, or [if] the plaintiff continued to litigate after it clearly became so." (citations and internal quotation marks omitted)).  "A prevailing defendant need not show bad faith by a plaintiff to be entitled to attorneys' fees, though such a showing provides an even stronger basis for the award."  *Carter*, 2013 WL 816257, at *3 (quoting *Panetta v. Crowley*, 460 F.3d 388, 399 (2d Cir. 2006)).  However, "[i]n applying the standard for an award of attorney's fees to prevailing defendants, 'courts must take care not to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation.'"  *Carter*, 2013 WL 816257, at *3 (quoting *LeBlanc–Sternberg v. Fletecher*, 143 F.3d 765, 770 (2d Cir. 1998)).

Although Plaintiff has ultimately not prevailed in his suit, the Court does not find the suit to be frivolous or vexatious as to warrant the awarding of attorneys' fees to Defendant.  Therefore, Defendant's application for attorneys' fees is denied.  *See, e.g.*, *Carter*, 2013 WL

816257, at *4 (denying defendants' motion for attorneys' fees where "it cannot be said that the claims against [the defendants] that were ultimately dismissed on summary judgment were unreasonable or without any basis in fact from the outset of the litigation so as to be deemed frivolous"); *Dorsett v. Cnty. of Nassau*, No. 11-CV-5748, 2013 WL 272796, at *6 (E.D.N.Y. Jan. 24, 2013) (denying the defendants request for attorney fees where the court could not "conclude on the record before it that plaintiffs'" claim was "frivolous"); *Valenti v. Massapequa Union Free Sch. Dist.*, No. 09-CV-977, 2012 WL 1038811, at *21 (E.D.N.Y. Mar. 28, 2012) ("[E]ven though the basis for this lawsuit was extremely thin and the unsuccessful opposition to the summary judgment motion was very weak, the Court does not believe attorneys' fees are warranted under the particular circumstances of this case.").

### III.   Conclusion

For the foregoing reasons, the Court grants Defendant's motion for summary judgment and denies Defendant's motion for attorney fees.  The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: July 18, 2013
        Brooklyn, New York

20